The next matter, number 23-1948, United States v. Arianjel Paredes. At this time, would counsel for the appellant please introduce herself on the record to begin. Good morning. Jean LaRocque for the defendant, Arianjel Paredes. I'd like to start out with my argument on the variance and the sufficiency of the evidence. My concern with this is that CW5 testified and put in the only direct evidence that the defendant was dealing drugs. But unfortunately, CW5 was not involved in the conspiracy that the defendant was charged with. There was basically two conspiracies. There was a chain conspiracy involving a DTO that Paredes allegedly supplied heroin and fentanyl to. And then there was a completely separate conspiracy involving the defendant and CW5. And they were selling cocaine and heroin and fentanyl to each other. But CW5 had absolutely nothing to do with the DTO. There was no drugs coming from CW5 through Paredes to Vedarte up to the DTO. So all of his evidence was completely irrelevant to the conspiracy charged involving the DTO. So your argument is there's no evidence directly connecting your client to the sales to DTO. There were the phone calls that were interpreted by the agents. But as far as CW5, there was no evidence at all. CW5 was in no way connected with the DTO. And the reason it came in is because they thought originally when they- I just want to make sure I understand whether you're making an evidentiary argument challenging the admission of that evidence as evidentiary error or whether you're making a sufficiency argument that the charged conspiracy was a cocaine and heroin-fentanyl conspiracy and there's no evidence of him agreeing to that full conspiracy with the co-conspirators because all there is is evidence of him participating in the fentanyl aspect of that conspiracy with those co-conspirators. Right. And I'm also making the argument that- When you said right. Yes. Which argument are you making? I'm making both arguments actually. Can we start with the sufficiency one? Because obviously if you win on that one, we don't have to worry about the evidentiary error. Right. Okay. So on the challenge to the existence of the full conspiracy, I understood you to be making an argument that there was insufficient evidence of anything other than having agreed to a more limited conspiracy. Correct. With that, what you're calling the DTO. Yes. Okay. And the reason is because there's only evidence that would support agreement as to the fentanyl portion of it, not to the cocaine part, notwithstanding the charge being that the agreement was to all those drugs. Correct. Okay. Yes. With respect to that, what about the phone calls showing a call, I think it's to Vidarte, followed by Vidarte calling your client? Yes, that was at the very beginning of the investigation. That's how they first connected the defendant, Paredes, because they were And why isn't that in line with the evidence that the defendant had the capacity to provide substantial quantities of cocaine, sufficient to support inferentially that, well, he's in league with the DTO on fentanyl. That DTO also is involved in cocaine. He has the capacity to provide cocaine. And there are calls from the DTO to the person he's engaged with in cocaine transactions, who right after that then calls him. Why isn't that conjuries of evidence enough circumstantially to support the idea that he had agreed to the Fuller conspiracy? I don't think there was. There wasn't any evidence as to what that phone call. They did call what turned out to be the defendant's number. Now, we don't know who he spoke to. He could have been standing next to CW5 for a while and handed him the phone, you know, anyone. All we know is there was a phone call. And then there was another phone call back to the Baez people saying this is the price. And the Baez people said, no, that's too expensive. We don't want to deal with it. So there was never an actual, that never ended up as an actual deal of cocaine. All the evidence was that Figueroa, a separate person, gave the DTO, provided the DTO with the cocaine. There was no evidence at all that CW5 was, CW5 and the defendant dealt with cocaine with Vidarte or the Baez DTO at all. And then if, I don't know if anyone else has questions about the sufficiency aspect of this, if there was evidence to support the sufficiency contention, you then have a, the variance issue goes away, I take it. If there was sufficient evidence of the charge conspiracy, there's no basis for the variance contention at that point. Right, the variance is just deals with the cocaine. But you then have a separate evidentiary argument that the CW5 testimony was evidentiary error because it was irrelevant. It was irrelevant, yes. And was that made below that argument? Yes, he brought in a motion to, a motion in limine, and I believe that was also his, the basis of his post conviction. I understood the government, maybe I misunderstood it to be saying, but that evidence could be relevant to demonstrating his capacity to provide cocaine in sufficient quantities, and therefore of some relevance to the overall picture they're trying to portray of his connection through those phone calls to the DTO's sale of cocaine. What's wrong with that contention? I don't think, there was no evidence of how much cocaine was sold from, so CW5 sold cocaine to the defendant, the defendant sold heroin to CW5. But there was, they didn't really get it, and then the defendant supposedly had other customers too. And did CW5 sell to Vidarte? There's no evidence of that, no, no. So CW5 was only involved with Heredes going back and forth. And so the fact that he was dealing in cocaine possibly, I don't, there was no evidence as to how much when, you know, they didn't really get into any evidence of what that, the only connection was at the beginning was maybe there was a phone call to his number at least, and then they said, no, that price is too high. So I don't think there was evidence that brought in that Heredes even, that he did deal with the DTO with cocaine. Do you want to just briefly touch on your first argument? The interpretation of the? Yeah, I guess I don't really understand your argument. I understood the motion in Lemonade, but then when I look at the transcript and what you're saying in your brief, I'm not sure exactly what you have a problem with. Well, I think the problem was that first they were in Spanish, and then they were translated into English. And the defense attorney didn't have any problem with that, that's what he agreed to. But what he had a problem with was after every, so they read back and forth, the prosecutor and the agents would read the phone calls or the text messages. And after every single time, it wasn't just what does 50 mean in that conversation or what does, you know, a pot does mean, how would you interpret that? It was what did you understand them to be saying after every single time they went through it. So he was interpreting, they were clear what they were saying. I don't think there was any need. Did you draw us to places in the transcript where that happened, where you specifically have a problem? I didn't specifically because it was after every single call they said it. I can provide the specific page numbers and say here was this call they read or text messages that they read. And after every single one, the prosecutor asked, and what do you understand they were saying? What was going on? So in answering, are there particular statements that are made in answering that question that don't match up with what would be a reasonable interpretation of a slang term or something like that and go beyond it? I think Judge Monacovo's question is, it's hard to discern from the brief what is the content of those answers that you were specifically saying goes beyond what would be permissible. Well, my problem was that it was just so general and that it was after every single call. The prosecutor never asked him what is 50, 100, maybe once in a while, but that I don't think would necessarily be problematic. What does 50 mean in this phone call? I'm not focused so much on the question. I'm focused on the answer. What did the witness say in response to the questions? They were talking about drug dealing. And so what is your understanding of it? There's no need for him to give his understanding that they were talking about drug dealing when it was clear. I mean, if there was a question about what does this mean, it's slang, it's code for drugs or weight or money, but that wasn't what he was going to. What were they talking about? Oh, they were talking about he was going to sell him drugs. So it was just too much of a general. So your problem is that whatever the answers were, they were too long. It's not that the witnesses were translating coded, not translating, I should say explaining coded language. It's that they were explaining more broadly. Right, yes. And what is your understanding of what that conversation was about? Okay, thank you. Thank you. Counsel to the appellee, please reintroduce himself on the record if you can. Good morning, Chief Judge Barron, and may it please the Court, Mark Quinlivan on behalf of the United States. If I could take the last issue first. And as a threshold matter, as we've set forth in the brief, in our view, this 701 claim is triply waived. It's waived to begin with because below, Defense Counsel only had a single objection to the testimony of this nature. It was to a specific interpretation that he believed Special Agent Gullixrud would make as to who a specific conversation was referencing, whether it was Vidarte or the defendant. And the government clarified that they shared that same understanding, and the objection was then withdrawn. So that's waiver number one. Waiver number two is consistent with, let me go back on that last one, because not only did Defense Counsel withdraw the objection, but he also expressly said he's entitled to interpret the coded references in the conversations. So that's waiver number one. Waiver number two is consistent with his view that the agents were entitled to make these interpretations. There was no objection to any of the testimony below, and the plain error standard isn't argued on appeal. So that's waiver number two. And waiver number three is, I believe my friend has made this across-the-board claim, but without identifying specific examples of the testimony that is asserted to be objectionable, and that's a waiver as well. And let me just respond to the across-the-board claim, because as we noted in our brief, there absolutely were coded references in the conversations. And the best example is that they would often talk about, or Mr. Vedarte would say, your car is ready. Now, Mr. Vedarte worked at A&R Towing, which was a functioning garage, and he was a mechanic there, so that clearly could literally be taken as a reference to somebody's car is ready. And that's why it was helpful for the jury, for Special Agent Gullixrud, to explain why that was in fact a reference to drugs, not to the car. In terms of the argument that every single question, let me just run through some examples. So joint appendix, volume two, page 184. There's a text message that's read where Mr. Vedarte writes to the defendant and says, hello, bro, I think he lied to me, he said he was stopped, et cetera. That's shortly after the September 24th transaction and stop. No, he's not asked to interpret that. Page 255 to 256, this is a call between. I take the point that there's many instances of things that were not coded language where he was not asked to answer. But I guess the concern is rather than asking what did car mean, they ask would you understand them to be talking about, and then without reference specifically to here's what car meant, he says, oh, in that conversation they're talking about drug dealing. So is there any concern the government has with, rather than identifying a coded word, asking for them to decode it, instead saying with respect to a conversation in which a coded word appears, simply saying what did you think they were talking about in that conversation, and then the witness says I think they were talking about drug dealing. You see the difference between the two? And I think that's the thrust of the concern. Absolutely, and I think, and we noted in our brief, and I think it goes back to this Court's decision in Obiora and related cases where I think this Court has rejected the argument that a witness is limited to just saying this specific reference means X and not giving a fuller context to how that is used in the situation. To the extent that defense counsel believed that the questioning of this nature was going too far beyond his initial objection or his initial concession that the agents were entitled to interpret coded conversations, that's when it's incumbent upon defense counsel to raise the objection. So the objection can be brought to the district court's attention, and if the court believes that the government has gone too far, then an instruction can be given in that regard. But that is completely absent from the record in this case. Just briefly on the variance issue. I'm sorry. Yes, sir. There was a motion in Lemonet pre-trial. So what do you say about that? Well, this is the situation, Judge Howard, in which Judge Hillman said he was going to temporize on it or he was going to allow the testimony to come in and we'll deal with it as the, you know, he did not rule on the motion in Lemonet. He said we'll see how the evidence comes in. And so this court has repeatedly said that when a district court does not make a definitive ruling on a motion in Lemonet of this nature, then what objection has to be made at trial, and it wasn't in this case. So, yeah, I take the point, but weren't the actual words closer to the following? The judge said, I'll reserve on that, and if I need to hear more from you at the time, I'll call on you. I believe he said I don't think that alters the calculus, Judge Howard, because at the end of the day he's still, you know, saying that, you know, an objection has to be made to the testimony, and if the judge himself wasn't concerned about the testimony, that only underscores the need for defense counsel to raise the objection and to bring it to the court's attention. Just briefly on the variance issue, I think it's, you know, the argument was that there is no connection whatsoever of CW5 from the charged conspiracy, and that's incorrect because, Chief Judge Berenice, I think you've nicely laid out, and as it's laid out in the brief, CW5 would supply, by his testimony, cocaine to the defendant of 100 to 200 grams every two or three weeks. We then have that evidence of the telephone call sequence, which is consistent with how this drug organization operated. Mr. Baez or CW6 would contact Mr. Vidarte and order drugs. Mr. Vidarte would then contact the defendant, and it would go back down. But the only thing we're missing is when Vidarte calls the defendant. We just don't know anything about the content of that call. That's right, because at that time they only had a wiretap on, I think it was Target Telephone 2. But that may be a good reason why you don't know what's in it, but it's not a good reason for concluding that we confer that the call was the crucial missing link that would tie him to the cocaine conspiracy. I think you could, Chief Judge Berenice, because what you do have is the contents of the conversation between Mr. Baez and Mr. Vidarte. Mr. Baez calls and asks for the prices of cocaine. To Vidarte? To Vidarte. Then Vidarte, according to the call records, immediately calls the defendant. And this is an immediate call? I think it was within 30 seconds to a minute. Same thing. After that call ends, Mr. Vidarte calls Mr. Baez back and relays the price of cocaine. And then you have the additional evidence that CW6, who was one of the two leaders of this drug trafficking organization and testified as a cooperating witness, testified that he sometimes would purchase the cocaine that he would be selling from Mr. Vidarte if he had it. Admittedly, Mr. CW6 testified he also obtained cocaine from Ricky Figueroa, but he did testify that some of the cocaines that he would be selling was obtained from Mr. Vidarte. So it's entirely consistent with the chain that was established with respect to this organization. And at the end of the day, any possible variance would be harmless because this isn't a case in which the defendant can be said to have been convicted of a conspiracy that he was not involved in, even if this court were to find that there is a variance. Lastly, just on the evidentiary. Just so I understand that piece of it. The variance would be he was only involved in the smaller conspiracy involving fentanyl? What would be the variance? Well, I think the argument, as I understand it, is the variance is CW5 also purchased fentanyl and heroin from the defendant. So CW5 supplying cocaine to the defendant, the defendant supplying heroin and fentanyl to CW5. And so I think the argument would be, or as I understand it, is that the jury convicted the defendant of the fentanyl and heroin part of the conspiracy based on his dealings with CW5, not the dealings with the Baez organization. That claim fails, if I could just briefly finish. That claim fails because the jury made specific drug weight findings that were entirely consistent with the controlled sales at issue involving the Baez organization. And I would just note as well, in the government's closing, the prosecutor expressly said that you can reach those drug weight calculations without considering any of his dealings with CW5. So the ultimate answer is even if there were a variance, this isn't a case in which the defendant can be said to have not been involved in the charged conspiracy and he also would have been involved in a separate conspiracy with CW5. There's no risk that he was convicted of a conspiracy that he had no involvement with. Thank you.